AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

4/28/21

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

| In the Matter of the Search of | |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) ) ) ) |

Information Associated with Certain Email Addresses Ending in "@rapidfacilities.com" That Is Stored At Premises Controlled By GoDaddy.com, LLC

Case No.  3:21-mj-158

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | | Offense Description |
|---|---|---|
| 18 U.S.C. § 1343 | Wire Fraud | |

The application is based on these facts:
SEE ATTACHED AFFIDAVIT

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA Colin C. Arbes, USPS-OIG
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ *(specify reliable electronic means)*.

Date:  04/28/2021

_____
*Judge's signature*

City and state:  Dayton, Ohio

Michael J. Newman, U.S. District Judge
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the email addresses listed below that is stored at premises owned, maintained, controlled, or operated by GoDaddy.com, LLC, a company located at 14455 N. Hayden Rd., Suite 226, Scottsdale, AZ 85260.

dhart@rapidfacilities.com,

fkc@rapidfacilities.com,

accounting@rapidfacilities.com,

service@rapidfacilities.com,

erin@rapidfacilities.com,

amanda@rapidfacilities.com,

erika@rapidfacilities.com,

jessica@rapidfacilities.com, and

jennifer@rapidfacilities.com.

1

**ATTACHMENT B**

**Particular Things to be Seized**

I.      **Information to be disclosed by GoDaddy.com, LLC (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to requests made under 18 U.S.C. § 2703(f) on or about October 22, 2020 and January 19, 2021, the Provider is required to disclose the following information to the government for any email address as described in Attachment A:

a.      The contents of all emails associated with the email address from January 1, 2017 to present, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email and any attachments;

b.      All records or other information regarding the identification of the email address, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d.      All records or other information stored by an individual using the email address, including address books, contact and buddy lists, calendar data, pictures, and files; and

1

e.     All records pertaining to communications between the Provider and any person regarding the email address, including contacts with support services and records of actions taken. The Provider is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

**II.     Information to be seized by the government**

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 1343 (wire fraud), those violations involving Rapid Facilities Services, LLC ("RFS"), Davy G. Hart, Jr., and/or others working for or with them and occurring on or after January 1, 2017, including (but not limited to), for each email address listed on Attachment A, information pertaining to the following matters:

(a) the submission of false and fraudulent claims relating to, involving, or arising from repair and/or maintenance jobs that were performed, or intended to be performed, by RFS or RFS subcontractors at USPS facilities;

(b) false statements or falsified documents relating to, involving, or arising from repair and/or maintenance jobs that were performed, or intended to be performed, by RFS or RFS subcontractors at USPS facilities;

(c) wire fraud, including any underlying fraud scheme, relating to, involving, or arising from repair and/or maintenance jobs that were performed, or intended to be performed, by RFS or RFS subcontractors at USPS facilities;

(d) Preparatory steps taken in furtherance of and attempted violations of the statute listed above;

(e) Evidence indicating how and when the email accounts were accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the users of the accounts;

(f) Evidence indicating the email account owner or user's state of mind as it relates to the crimes under investigation;

(g) The identity of the person(s) who created or used the email address, including records that help reveal the whereabouts of such person(s); and

(h) The identity of the person(s) who communicated with the email address relating to the above-described matters, including records that help reveal their whereabouts.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH certain email addresses ending in "@rapidfacilities.com" THAT IS STORED AT PREMISES CONTROLLED BY GoDaddy.com, LLC | Case No. _____<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Colin C. Arbes, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for electronic information associated with certain accounts controlled by GoDaddy.com, LLC, a company located at 14455 N. Hayden Rd., Suite 226, Scottsdale, AZ 85260.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require GoDaddy.com, LLC to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I am a Special Agent with the United States Postal Service (USPS), Office of Inspector General (OIG) and have been since October 2, 2004.  Pursuant to the Inspector General Act of 1978, 5 U.S.C. app. III § 8G, the USPS-OIG is empowered to investigate fraud and abuse in USPS programs and operations.  I received training in conducting investigations from the

1

Federal Law Enforcement Training Center. I have conducted multiple investigations involving white collar crime, to include contract fraud, financial fraud, healthcare fraud, and public corruption. I have been an affiant on previous search warrant applications and have participated in the execution of multiple search warrants and arrests. As a Special Agent with the USPS-OIG, I am authorized to execute warrants, make arrests, and seize property authorized under law pursuant to 18 U.S.C. § 3061. My duties as a special agent of the USPS-OIG include the current investigation of Rapid Facilities Services, LLC ("RFS")[1] and Davy G. Hart, Jr. ("Hart"), also known as Dave Hart and Davy Hart.

3.      This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all my knowledge about this matter. The affidavit is based on, among other things, a review of relevant documents and records obtained from a variety of sources, witness interviews, and physical surveillance. Over the course of the investigation, I have learned information from other law enforcement personnel, and this affidavit does not distinguish between facts of which I have direct knowledge and facts of which I have indirect knowledge. Any conversations, communications, documents, or other sources of information described in this affidavit may be summarized and/or paraphrased and are not necessarily detailed in full or verbatim.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1343 (wire fraud) have been committed by RFS and Hart. There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

_____

[1] RFS appears with and without the "LLC" (and in some cases with a period after the "LLC") in the documents and records that have been examined in the course of the investigation.

## **JURISDICTION**

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## **PROBABLE CAUSE**

6.      This investigation concerns potential fraud by RFS, Hart, and/or others in connection with repair and/or maintenance services performed at USPS facilities. Based on the investigation to date, RFS appears to have fraudulently concealed its use of subcontractors to perform certain jobs at USPS facilities in order to charge the USPS inflated prices.

7.      As reflected in a contract between the USPS and EMCOR executed in July 2015, the USPS has used EMCOR Facilities Services, Inc. ("EMCOR")[2] as an agent to coordinate certain repair and maintenance work performed at USPS facilities by third-party service providers. Generally speaking, EMCOR's duties in this role include receiving service calls for needed work at USPS facilities, obtaining proposals from service providers for completing the work, dispatching work orders to service providers, and receiving and processing invoices from service providers. As the agent for the USPS, EMCOR pays service providers with funds received from the USPS.

---

[2] As used in this affidavit, EMCOR may refer to EMCOR Facilities Services, Inc. and/or to any related companies, businesses, or entities that perform the described functions for the USPS.

8.    RFS[3] was engaged through EMCOR to perform certain repair and/or maintenance work at USPS facilities.  In Supplier Agreements between RFS and EMCOR executed in 2016 and 2018, the company address was listed as 3534 Linden Avenue, Dayton, Ohio 45410, and the company website was listed as www.rapidfacilities.com.  Dave Hart was listed as an owner of RFS in both Supplier Agreements, and his email address was included as dhart@rapidfacilities.com in the 2016 Supplier Agreement and fkc@rapidfacilities.com in the 2018 Supplier Agreement.  Both Supplier Agreements included accounting@rapidfacilities.com as an email address for accounts receivable.  The 2016 Supplier Agreement lists amanda@rapidfacilities.com as the email of another owner (who also appears to be listed as the contact for accounts receivable), jessica@rapidfacilities.com as the email of the customer service operations manager, and service@rapidfacilities.com as the service email.  The 2018 Supplier Agreement lists erin@rapidfacilities.com as the email of the operations manager.

9.    Physical surveillance conducted by USPS-OIG at 3534 Linden Avenue in Dayton, OH on or about March 10, 2020 indicated that RFS was located at that address.  This location was a single-story space in a strip mall located in the outskirts of Dayton, Ohio.  Based on information provided by the owner of the property, it is believed that RFS vacated the premises due to non-payment of rent in approximately July 2020.  The RFS website – www.rapidfacilities.com – remains active as April 27, 2021.

---

[3] As reflected in public records available through the Ohio Secretary of State's website, Rapid Facilities Services, LLC. is a fictitious name registered effective January 28, 2017 by Dave Hart LLC. with a business address of 3534 Linden Ave, Dayton, OH 45431.  Dave Hart LLC. was organized/registered as a domestic limited liability company in Ohio in around September 2006, and the organization/registration form was signed by Hart.  Based on, among other things, a 2016 Supplier Agreement between RFS and EMCOR, it appears that Hart was using the RFS name prior to the January 2017 fictitious-name registration.

4

10.     Between 2017 and 2020,[4] EMCOR issued RFS over 1,300 work orders for repair and maintenance services at USPS facilities.  The USPS paid over $2.2 million for these services, per USPS electronic Facilities Management System (eFMS) data.[5]  According to invoices provided to EMCOR and the USPS, RFS reportedly performed work in 40 different states during this approximate time period.

11.     As indicated above, RFS entered into Supplier Agreements with EMCOR in 2016 and 2018, which contained requirements governing RFS' provision of repair and maintenance services to the USPS in connection with jobs assigned through EMCOR.    Among other things, the 2016 and 2018 Supplier Agreements both include a schedule of allowable labor rates for certain trade/service classifications (*e.g.*, roofing, mechanical, and plumbing).[6]  The 2016 and 2018 Supplier Agreements also contain terms relating to allowable trip charges for travel to certain jobs, as well as terms relating to the maximum allowable markups RFS could charge for materials (20%) and rented equipment (20%).  In addition, the 2016 and 2018 Supplier Agreements set forth certain requirements related to RFS' use of subcontractors to perform work for the USPS, specifying, *inter alia*, that markups on subcontracted work are subject to limits and must be disclosed.  Below is an excerpt from the 2018 Supplier Agreement related to the limits on markups in connection with work performed for the USPS (the 2016 Supplier Agreement contains substantially the same language):

---

[4] RFS is no longer being engaged to perform work at USPS facilities as of on or about September 10, 2020.

[5] eFMS is the system in which the Postal Service manages its properties, both owned and leased.  It is also used to record expenses for each facility, including repair and maintenance.

[6] The tables setting forth the labor rates in the Supplier Agreements include a column to indicate whether each trade/service classification is self-performed or subcontracted.  The 2016 and 2018 Supplier Agreements specify "Both" for every trade/service classification.

5

4) Markups on Subcontracted Work: Markups on work subcontracted by Supplier shall be allowed in accordance with the following: the Postal Service will allow and pay for one (1) tier of subcontract markup, and in all cases, any markup by Supplier on subcontracted work shall be clearly identified on the initial cost proposal.

   Markups for sub-contracted efforts invoicing shall be as follows:

   - $0.00 to $500.00 no more than $50 markup
   - $501.00 to $15,000.00 no more than 10% mark up
   - $15,001.00 to $25,000.00 no more than 8% mark up

5) Markups on Self-performed Work:
   - Labor: Work self-performed by Supplier shall be billed at reasonable hourly rates commensurate with the trades required to complete the work.
   - Material, Parts and Rented Equipment: Supplier can apply no more than a 20% markup on these items, required to complete the work.
   - No additional markup on self-performed work shall be permitted since all other overhead and loads are built into these rates.

6) Markups on Material Parts and Rented Equipment: Prime Suppliers and subproviders can apply no more than a 20% markup on all materials, parts or rented equipment.

The 2016 and 2018 Supplier Agreements also specify that RFS is required to use the EMCOR Customer Solutions Center Invoice Management Portal ("IMP"). As reflected in the Supplier Agreements, the IMP is used to track and submit invoices electronically.

12.    On or about January 29, 2020, USPS-OIG received a hotline referral from the USPS Inspection Service relating to a report of possible contract fraud involving Rapid Facilities.[7] The report was made by a Postmaster in Chesterfield, VA. The Postmaster indicated that USPS uses Rapid Facilities for maintenance repairs where Rapid Facilities hires a contractor to perform the work. The Postmaster further advised that the hired contractor had called him several times because he had not received payment from Rapid Facilities for work completed in October 2019.

13.    The USPS-OIG began an investigation, which has included: (i) searching the eFMS database to identify repair and maintenance jobs purportedly completed by RFS; (ii) obtaining and reviewing documentation and records from EMCOR and relevant USPS facilities and personnel

_____

[7] Public records available through the Ohio Secretary of State's website also indicate that Davy Hart registered the fictitious name of Rapid Facilities effective in September 2014 and that the registration of the Rapid Facilities name was cancelled by operation of law effective in September 2019. Based on, among other things, Ohio Secretary of State records and supplier agreements obtained from EMCOR, it appears that Rapid Facilities and Rapid Facilities Services, LLC were used over time as names for the same business owned by Hart.

6

relating to repair and maintenance services provided by or through RFS; and (iii) identifying, interviewing, and/or obtaining documentation from certain subcontractors engaged by RFS to perform work at USPS facilities.[8]

14.     Based on the investigation to date, USPS-OIG has identified over 30 specific instances in which RFS appears to have tried fraudulently to conceal its use of subcontractors from EMCOR – through the submission of misleading documentation containing misrepresentations and/or omissions – in order to charge the USPS inflated prices. For at least 20 of these jobs, the subcontractors reported receiving less than full or zero pay from RFS.

15.     The following are three examples of jobs at which RFS appears to have fraudulently concealed or failed to disclose its use of subcontractors in order to apply an inflated markup and/or charge improper fees:

      A. East Peoria, IL Carrier Annex

          i. In or around August 2019, RFS was engaged to replace ballasts in light fixtures at a USPS carrier annex in East Peoria, Illinois. As reflected in eFMS, the USPS ultimately paid $7,337.02 for this job.

         ii. USPS-OIG obtained and reviewed documents provided by EMCOR related to the job at the East Peoria, IL carrier annex, including, among other things, what appear to be the following:

           (a) A proposal from RFS, dated August 21, 2019, totaling $7,337.02, which included $2,520.00 for labor, $3,705.84 for 36 ballasts, material markups of

---

[8] Certain of these subcontractors were identified because they complained to EMCOR and/or the USPS that they had not been paid. Others, although not expressly disclosed in proposals or invoices, were identified because their names were somehow visible in pictures submitted by RFS to EMCOR to show completion of work (*e.g.*, a subcontractor uniform or van was visible).

$741.18 on the ballasts, a $70.00 trip charge, and $300.00 for disposal of debris. The proposal does not disclose that any work will be subcontracted.

(b) A document, signed by a representative of RFS and dated September 6, 2019, verifying that RFS self-performed the work.

(c) An invoice from RFS, dated September 17, 2019, totaling $7,337.02, which included the same charges listed on the proposal.

(d) An undated invoice from Dave Hart LLC to Rapid Facilities Services for 36 ballasts at a price of $3,705.84.

None of the documents received from EMCOR related to this job contained an express disclosure from RFS that a subcontractor was or would be used to perform the work, nor did any of the documents disclose the prices that the subcontractor was charging RFS.

iii. USPS-OIG contacted Oberlander Electric ("Oberlander") about the job at the carrier annex. USPS-OIG communicated with the service manager at Oberlander, who advised that Oberlander did work on the lights at the East Peoria carrier annex for RFS and that, as of April 17, 2020, Oberlander had not been paid for the work. The service manager indicated that the total invoiced amount to RFS was $2,886.82. The service manager advised that only Oberlander personnel were involved in the repairs they made at the East Peoria carrier annex and that RFS did not do any of the work.

iv. USPS-OIG obtained documents provided by Oberlander relating to the job at the East Peoria carrier annex, including, among other things, what appear to be the following:

8

(a) A work order from RFS, dated August 26, 2019, in the amount of $2,696.00. The work order stated, *inter alia*: "Upon arrival please check in with the supervisor on duty and identify yourself as a representative of Rapid Facilities Services[,]" and "Do not leave copies of invoices, pricing, work orders or any type of paperwork with the site, unless otherwise instructed by RFS."

(b) An invoice from Oberlander to RFS, dated September 19, 2019, totaling $2,886.82, which included $1,999.50 for labor, $847.17 for 36 ballasts, and $40.15 for other materials.

(c) Email correspondence relating to the job, dated between August 19 and September 10, 2019, involving the Oberlander service manager and the email addresses andrea@rapidfacilities.com, erin@rapidfacilities.com, and erika@rapidfacilities.com.

v. Based on the documents and information from EMCOR and Oberlander, it appears that: (a) Oberlander charged RFS $2,886.82 for the East Peoria job; (b) RFS charged the USPS $7,337.02; and (c) RFS submitted misleading documents to EMCOR in order to conceal its use of Oberlander and charge an impermissibly large markup.

B. Lansdowne, PA Post Office

    i. In or around February 2019, RFS was engaged to replace the fire alarm system at a post office in Lansdowne, PA. As reflected in eFMS, the USPS ultimately paid $8,351.00 for this job.

    ii. USPS-OIG obtained and reviewed documents provided by EMCOR related to the job at the Lansdowne post office, including, among other things, what appear to be the following:

    (a) A proposal from RFS, dated February 19, 2019, totaling $8,351.00, which included $4,940.00 for labor, $2,467.50 for parts related to the fire alarm system, material markup of $493.50, a $100.00 trip charge, and $350.00 for disposal of debris. The proposal does not disclose that any work will be subcontracted.

    (b) An invoice from RFS, dated April 8, 2019, totaling $8,351.00, which included the same charges listed on the proposal.

    (c) An undated document from Dave Hart LLC in the form or a receipt or invoice to RFS listing parts related to the fire alarm system for $2,467,50.

None of the documents received from EMCOR contained an express disclosure from RFS that a subcontractor was or would be used to perform the work at the Lansdowne post office, nor did any of the documents disclose the prices that the subcontractor was charging RFS.[9]

---

[9] In a photograph of a fire panel provided to EMCOR, a business card for Pletcher Fire Protection, LLC can be seen taped to the corner of the panel.

10

iii. USPS-OIG contacted Pletcher Fire Protection, LLC ("Pletcher") about the job at the Lansdowne post office. USPS-OIG communicated with the owner of Pletcher, who advised that Pletcher did work on the fire alarm system at the Lansdowne, PA Post Office for RFS and that, as of April 13, 2020, Pletcher had not been paid for the work. The owner indicated that the total invoiced amount to RFS was $4,703.50. The owner advised that only Pletcher personnel were involved in the repairs they made at the Lansdowne, PA Post Office and that RFS did not do any of the work.

iv. USPS-OIG obtained documents provided by Pletcher relating to the job at the Lansdowne post office, including, among other things, what appear to be the following:

    (a) An invoice from Pletcher to RFS, dated March 29, 2019, totaling $4,703.50, which included $3,040.00 for labor and $1,663.50 for parts related to the fire system.

    (b) Email correspondence relating to Pletcher's attempts to obtain payment from RFS, dated between July 31 and September 10, 2019, involving Pletcher and the email address jennifer@rapidfacilities.com.

v. Based on the documents and information from EMCOR and Pletcher, it appears that: (a) Pletcher charged RFS $4,703.50 for the Lansdowne job; (b) RFS charged the USPS $8,351.00; and (c) RFS submitted misleading documents to EMCOR in order to conceal its use of Pletcher and apply an impermissibly large markup.

11

C.  Trenton, IL Post Office

   i.  In around October 2018, RFS was engaged to repair the HVAC system at a post office in Trenton, IL.  As reflected in eFMS, the USPS ultimately paid $16,115.46 for this job.

   ii.  USPS-OIG obtained and reviewed documents provided by EMCOR related to the job at the Trenton post office, including, among other things, what appear to be the following:

      (a)  A proposal from RFS, dated October 4, 2018, totaling $16,115.46, which included $3,388.00 for labor, $8,825.61 for materials related to the HVAC system, $415.96 for additional materials, material markup of $1,848.31, $612.58 for shipping, a $75.00 trip charge, $600.00 for equipment, and $350.00 for disposal of debris.  The proposal does not disclose that any work will be subcontracted.

      (b)  An invoice from RFS, dated January 1, 2019, totaling $16,115.46, which included the same charges listed on the proposal.

      (c)  U.S. Department of Labor Payrolls for the periods of December 9 – 15 and 17 – 22, 2018, signed by Dave Hart and dated January 7, 2019, indicating that four RFS employees had worked at the Trenton post office.

      (d)  An undated document from Dave Hart LLC in the form or a receipt or invoice to RFS for materials related to the HVAC system and shipping for $8.825.61 and shipping for $612.58.

   None of the documents received from EMCOR contained an express disclosure from RFS that a subcontractor was or would be used to perform the work at the

Trenton post office, nor did any of the documents disclose the prices that the subcontractor was charging RFS

iii.   USPS-OIG contacted Kohnen Air Conditioning and Heating, Inc. ("Kohnen") and obtained information about the job at the Trenton post office. USPS-OIG communicated with the VP of Operations from Kohnen, who indicated that he was paid for the work completed at the Trenton, IL post office and that he did not know or employ the individuals whose names were listed on the RFS payroll.

iv.   USPS-OIG obtained documents from Kohnen relating to the job at the Trenton post office, including, among other things, what appear to be the following:

(a)   A work order from RFS, dated November 29, 2018, in the amount of $12,720.00. The work order stated, *inter alia*: "Upon arrival please check in with the supervisor on duty and identify yourself as a representative of Rapid Facilities Services[,]" and "Do not leave copies of invoices, pricing, work orders or any type of paperwork with the site, unless otherwise instructed by RFS."

(b)   An invoice from Kohnen to RFS, dated December 31, 2018, totaling $12,720.00, which included $4,920.00 for installation labor and crane and $7,800.00 for parts related to the HVAC system.

v.   Based on the documents and information from EMCOR and Kohnen, it appears that: (a) Kohnen charged RFS $12,720.00 for the Trenton job; (b) RFS charged the USPS $16,115.46; and (c) RFS submitted misleading documents to

13

EMCOR in order to conceal its use of Kohnen and apply an impermissibly large markup.

16.     As part of the investigation, USPS-OIG contacted the Director of Global Subpoena Compliance at GoDaddy concerning "@rapidfacilities.com." Per www.godaddy.com, GoDaddy[10] provides services and products related to, among other things, domain registration, website hosting, and email hosting. GoDaddy's email services allow a customer to set up email addresses corresponding with their domain name (*e.g.*, "address@domain.com") and host their email with GoDaddy, even if the customer's underlying domain name (*e.g.*, "www.domain.com") is registered with, and its website is hosted by, another provider. In order for a customer to use GoDaddy email when the customer's domain name is hosted by another company, the customer must point its so-called "MX records" to GoDaddy. As explained in GoDaddy's "Help Center," MX records "specify and prioritize the incoming mail servers that receive email messages sent to your domain name." In other words, MX records direct email messages that are sent to a particular domain name to the email provider.

17.     On or about October 21, 2020, the Director of Global Subpoena Compliance at GoDaddy indicated to USPS-OIG that, while the domain name rapidfacilities.com was not registered or hosted with GoDaddy.com, the MX did point to GoDaddy.com, LLC. The Director of Global Subpoena Compliance confirmed that requests for content related to email accounts ending in @rapidfacilities.com should therefore be directed to GoDaddy.com, LLC. Accordingly, it appears that GoDaddy served as the email host for @rapidfacilities.com email addresses.

---

[10] GoDaddy is used in this affidavit to refer to the entity or entities offering services through www.godaddy.com. As disclosed in a public securities filing available through GoDaddy's Investor Relations page, there appear to be a number of GoDaddy entities, including GoDaddy Inc. and its subsidiaries (such as GoDaddy.com, LLC). GoDaddy's online privacy policy indicates that "GoDaddy.com LLC is the data controller for www.godaddy.com."

18.     Based on queries conducted on CentralOps.net[11] on or about March 11, 2020, on or about October 19, 2020, and on or about April 26, 2021, it appears that the MX records for rapidfacailities.com were the same on each of those dates, specifying "smtp.secureserver.net" and "mailstore1.secureserver.net."[12]     Thus, it appears that GoDaddy has hosted email for @rapidfacilities.com email accounts during at least the period from on or about March 11, 2020 through on or about April 26, 2021.

19.     On or about October 22, 2020, a request pursuant to 18 U.S.C. § 2703(f) was served on GoDaddy.com, LLC, for preservation for a period of 90-days of all stored communications, records, and other evidence regarding the account hosting the @rapidfacilities.com domain.  On or about January 19, 2021, an extension request pursuant to 18 U.S.C. § 2703(f) was sent to GoDaddy.com, LLC for preservation for an additional period of 90 days of the same items.[13]

20.     The investigation has ascertained that the dhart@rapidfacilities.com email address has continued to be used as recently as on or about March 19, 2021 to communicate concerning electrical work performed at a USPS facility in Shoals, Indiana.  More specifically, Hart appears to have used the dhart@rapidfacilities.com address to send an email to a subcontractor, copying certain "@usps.gov" and "@emcor.net" addresses.  In the email, which is signed by "Dave Hart" of "Rapid Facilities Services," Hart appears to be attempting to assure the subcontractor that he has every intention of paying the subcontractor for its work at the Shoals, Indiana facility.  The

---

[11] "Centralops.net" is a public internet domain registration research service that can be used to verify internet domain registrations and check the MX records for a given domain

[12] Based on an entry in GoDaddy's "Help Center," these appear to be MX records associated with GoDaddy.  *See* Check and manage my MX records, available at:  https://www.godaddy.com/help/check-and-manage-my-mx-records-7590.

[13] Prior to the requests served on GoDaddy.com, LLC, requests for preservation were served on Wild West Domains, LLC (an affiliated company) on or about April 23, 2020 and July 10, 2020.

email appears to be part of a chain discussing the fact that RFS has not yet paid the subcontractor, which has been seeking payment directly from the USPS.

## BACKGROUND CONCERNING EMAIL

21.    In general, an email that is sent to an email service subscriber is stored in the subscriber's "mailbox" on the servers of the email host until the subscriber deletes the email. If the subscriber does not delete the message, the message (including any attachments) can remain on the servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on the email host's servers for a certain period of time.[14]

22.    In my training and experience, I have learned that email providers provide a variety of on-line services, including email access, to their users. As indicated above in paragraphs 18 and 19, GoDaddy offers certain services related to email, including domain-based email and storage for email, contacts, and calendars. Therefore, the computers of GoDaddy.com, LLC are likely to contain stored electronic communications (including retrieved and unretrieved email for GoDaddy subscribers) and information concerning subscribers and their use of GoDaddy's services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users or the method and means by which a scheme is executed.

23.    In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, emails in the account, and attachments to emails, including pictures and files.

---

[14] GoDaddy's subpoena policy indicates that "Go-Daddy's e-mail servers do not retain deleted or sent e-mail."

24.     In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

25.     In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

26.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically

17

retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

27. As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contact lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. Email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's

state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION

28.     Based on the forgoing, I request that the Court issue the proposed search warrant.

29.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on GoDaddy.com, LLC. Because the warrant will be served on GoDaddy.com, LLC, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Colin C. Arbes
Special Agent
United States Postal Service, Office of
Inspector General

Subscribed and sworn to before me on April 28, 2021

Michael J. Newman
United States District Judge

19